No. 25-60455

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

LOUISIANA BUCKET BRIGADE; SIERRA CLUB*,*
*Petitioners*

v.

LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY;
COURTNEY BURDETTE, in her official capacity as Secretary of the Louisiana Department of Environmental Quality,
*Respondents*

---

VENTURE GLOBAL CP2 LNG, L.L.C.,
*Intervenor.*

---

On Petition for Review of Orders of the Louisiana Department of Environmental Quality

---

# INITIAL BRIEF OF PETITIONERS

---

David Bookbinder
Environmental Integrity Project
888 17th Street, NW
Washington, D.C. 20006
Telephone: (301) 751-0611
dbookbinder@environmentalintegrity.org
*Counsel for Petitioners Louisiana Bucket Brigade and Sierra Club*

Joshua D. Smith
Sierra Club
2101 Webster St, Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5560
joshua.smith@sierraclub.org
*Counsel for Sierra Club*

**Dated: January 15, 2026**

## CERTIFICATE OF INTERESTED PERSONS

Case No. 25-60455

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case:

- Petitioner Louisiana Bucket Brigade, a Louisiana based non-profit organization;
- Petitioner Sierra Club, a nonprofit organization that is organized and exists under the laws of California;
- David Bookbinder with the Environmental Integrity Project (Counsel for Petitioners Luisiana Bucket Brigade and Sierra Club);
- Joshua D. Smith with Sierra Club (Counsel for Sierra Club);
- Respondent Louisiana Department of Environmental Quality; and
- Respondent Courtney J. Burdette, in her official capacity as Secretary, Louisiana Department of Environmental Quality;
- Jorge Benjamin Aguinaga with the Louisiana Department of Justice (Counsel for Respondent);
- Jill Carter Clark with the Louisiana Department of Environmental Quality (Counsel for Respondent);
- Elizabeth Baker Murrill with the Office of the Attorney General for the State of Louisiana (Counsel for Respondent);
- Kelsey LeeAnn Smith the Louisiana Department of Justice (Counsel for Respondent);
- Respondent-Intervenor Venture Global CP2 LNG, L.L.C.;

- Kirsten Bahnson with McGuire Woods, L.L.P. (Counsel for Respondent-Intervenor);
- Andrew D. Knudsen with McGuire Woods, L.L.P. (Counsel for Respondent-Intervenor);
- Lauren J. Rucinski with McGuire Woods, L.L.P. (Counsel for Respondent-Intervenor);
- Allison D. Wood with McGuire Woods, L.L.P. (Counsel for Respondent-Intervenor).

*s/ Joshua D. Smith*
Joshua D. Smith
Sierra Club
2101 Webster St, Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5560
joshua.smith@sierraclub.org
*Counsel for Sierra Club*

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 28.2.3, Petitioners Louisiana Bucket Brigade and Sierra Club respectfully request that the Court hold oral argument in this case. At issue is whether the Louisiana Department of Environmental Quality violated the Clean Air Act when it issued permits authorizing construction and operation of the Venture Global CP2 LNG terminal. Sierra Club respectfully submits that oral argument would assist the Court with the technical and complex factual and legal issues as well as the voluminous administrative record in this case.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........ i
REQUEST FOR ORAL ARGUMENT ........ iii
TABLE OF CONTENTS ........ iv
TABLE OF AUTHORITIES ........ vi
GLOSSARY ........ ix
JURISDICTIONAL STATEMENT ........ 1
I. Venue and Forum ........ 1
II. Standing ........ 2
STATEMENT OF ISSUES ........ 7
STATEMENT OF THE CASE ........ 7
I. Introduction ........ 7
II. Legal Framework ........ 9
A. The Clean Air Act ........ 9
B. Prevention of Significant Deterioration ........ 9
C. Best Available Control Technology ........ 10
III. Factual Background ........ 11
A. Project Overview ........ 11
B. Procedural History ........ 12
C. The Permit ........ 12
SUMMARY OF ARGUMENT ........ 13
ARGUMENT ........ 16

I. Standard of Review ....................16

II. The Permit's NOx, VOC, and CO Emission Limits for CP2's .Combined Cycle Turbines Do Not Reflect the Best Available .Control Technology, and Are Arbitrary and Capricious. ....................18

A. LDEQ Failed to Explain the Basis of its Decision That the Permit's Emission Limits Are BACT. ....................18

i. The "Power Island" Explanation ....................20

ii. The "Fuel Gas" Explanation ....................20

B. Venture Global's Application for the Permit Conceded that CP2's Combined Cycle Turbines Could Meet a Lower NOx Standard than the Permit's 2.5 ppm Limit. ....................27

III. Vacatur Is the Appropriate Remedy. ....................28

CONCLUSION ....................28

CERTIFICATE OF SERVICE ....................30

CERTIFICATE OF COMPLIANCE ....................31

CERTIFICATE OF ELECTRONIC COMPLIANCE ....................32

# TABLE OF AUTHORITIES

**Cases**

*10 Ring Precision, Inc. v. Jones*,
722 F.3d 711 (5th Cir. 2013)....16

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004)....11, 28

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.,*
528 U.S. 167 (2000)....2

*Gulf Restoration Network v. Salazar*,
683 F.3d 158 (5th Cir. 2012)....6

*Healthy Gulf v Secretary, LA Dept of Nat Resources*,
407 So.3d 705 (2024)....16

*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*,
452 U.S. 264 (1981)....9

*Hunt v. Washington State Apple Advertising Commission,*
432 U.S. 333 (1977)....2

*In re American Waste and Pollution Control Co.,*
642 So.2d 1258 (1994)....20, 27, 28

*In re E.I. du Pont de Nemours & Co.*,
674 So.2d 1007 ((La.App. 1 Cir. 4/24/96)....27, 28

*In re Rubicon, Inc.,*
670 So.2d 475 (La.App. 1 Cir. 2/14/96)....28

*LaRocca v. Louisiana*,
364 So.3d 1246 (La. App. 5 Cir. 5/10/23)....17

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....6

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins*.,
463 U.S. 29 (1983)....17, 18

*MultiCare v. State, Dept. of Health & Hospitals*,
00-2001, p. 3 (La. App. 1st Cir. 11/9/01), 804 So.2d 673....17

*Safe Air for Everyone v. EPA*,
488 F.3d 1088 (9th Cir. 2007)....9

*Save Our Cmty. v. U.S. EPA,*
971 F.2d 1155 (5th Cir. 1992) ....................................................................3

*Save Ourselves, Inc. v Louisiana Env't Control Comm'n*,
452 So.2d 1152 (1984).................................................................... 15, 27

*Sierra Club v. Louisiana Dep't of Env't Quality*,
100 F.4th 555 (5th Cir. 2024) ........................................................... 2, 16

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*,
73 F.3d 546 (5th Cir. 1996)....................................................................5

**Statutes**

15 U.S.C. § 717r.............................................................................................1

42 U.S.C. § 7410 .........................................................................................1, 9

42 U.S.C. § 7470-7479 ...............................................................................10

42 U.S.C. § 7475 ........................................................................................10

42 U.S.C. § 7661a ..........................................................................................1

42 U.S.C. § 7661c ..........................................................................................1

La. R.S. § 30:2050.21 ....................................................................................2

La. R.S. § 49:978.1 ............................................................................ 16, 17, 28

**Regulations**

40 C.F.R. § 52.970 ......................................................................................1, 9

LAC 33:III.101.............................................................................................1, 9

LAC 33:III.509.......................................................................................... 10, 18

**Federal Register Notices**

75 Fed. Reg. 6474 (Feb. 9, 2010) ...................................................................8

80 Fed. Reg. 65292 (Oct. 26, 2015)...................................................................8

**Other Authorities**

*Commonwealth LNG LLC*,
191 FERC ¶ 61,205 (June 18, 2025) ............................................................12

EPA, AP 42, Fifth Edition, Volume I Chapter 1: External Combustion Sources,
Section 1.4 Natural Gas Combustion ..........................................................26

*Holtzclaw, To Defer or Not To Defer: The Standard of Review Regarding Administrative Rulings In The Appellate Courts of Louisiana,*
40 S.U.L. REV. 435 (Spring 2013) ...............................................................17

## GLOSSARY

The following acronyms and abbreviations used in this brief:

| | |
|---|---|
| BACT | Best Available Control Technology |
| CO | Carbon Monoxide |
| EPA | Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| LDEQ | Louisiana Department of Environmental Quality |
| LNG | Liquefied Natural Gas |
| NAAQS | National Ambient Air Quality Standards |
| $NO_x$ | Nitrogen Oxides |
| PSD | Prevention of Significant Deterioration |
| SIP | State Implementation Plan |
| VOC | Volatile Organic Compounds |

# JURISDICTIONAL STATEMENT

## I. Venue and Forum

This case concerns a Clean Air Act permit issued by Respondent Louisiana Department of Environmental Quality ("LDEQ") allowing Venture Global CP2 LNG, L.L.C., to construct and operate the proposed CP2 liquified natural gas ("LNG") export terminal ("CP2"). *See* CI:1 (Permit No. PSD-LA-847) (the "Permit").[1]

Under the Natural Gas Act, 15 U.S.C. § 717r(d)(1), this Court shall have "original and exclusive jurisdiction over any civil action for the review of an order or action of … a State administrative agency acting pursuant to Federal law to issue … any permit" for construction of an LNG facility within this Circuit. LDEQ issued the Permit at issue under the Clean Air Act and Louisiana's federally-enforceable State Implementation Plan. ("SIP"). *See* 42 U.S.C. § 7410 *et. seq*.; 40 C.F.R. § 52.970(c) (identifying EPA-approved regulations in the Louisiana SIP); LAC 33:III.101, *et. seq*. (Louisiana SIP provisions). This Court has held it has original and exclusive jurisdiction when LDEQ issues air permits for an LNG

[1] Major sources must also obtain a Clean Air Act Title V permit, which includes all requirements governing the source's operations. 42 U.S.C. §§ 7661a and 7661c. LDEQ issued CP2's Title V permit in conjunction with its PSD permit, but LDEQ's compliance with the Act's Title V requirements is not directly at issue.

facility pursuant to its SIP. *Sierra Club v. Louisiana Dep't of Env't Quality*, 100 F.4th 555, 564-65 (5th Cir. 2024).

Petitioners have satisfied all other jurisdictional prerequisites by timely filing their Petition for Review; LDEQ issued the Permit on July 22, 2025, and Petitioners filed the Petition for Review on August 21, 2025. La. R.S. § 30:2050.21(A).[2]

**II. Standing**

An organization has standing if individual members would have standing, the interests at stake are germane to the organization's purpose, and the lawsuit does not require the participation of individual members. *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343 (1977).

Petitioners' individual members have standing because (1) they have suffered a concrete and imminent "injury in fact"; (2) that is fairly traceable to the challenged action; and (3) is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000) (internal citations omitted). Any "harm to aesthetic, environmental, or recreational

[2] Unless otherwise indicated, this brief cites to the document numbers referenced in LDEQ's November 5, 2025 Certified Index ("CI") (ECF Doc. 34), and specific "pdf" page number within each document, *e.g.*, CI document ## : pdf page ##. As noted in the CI, documents that LDEQ uploaded to its Electronic Document Management System may be retrieved from https://edms.deq.louisiana.gov/edmsv2/advanced-search. The CI also includes hyperlinks to documents in the record.

interests is sufficient to confer standing, . . . these need not be large, an identifiable trifle will suffice." *Save Our Cmty. v. U.S. EPA,* 971 F.2d 1155, 1161 (5th Cir. 1992) (internal quotations and citations omitted).

Petitioners satisfy each of those requirements. First, LDEQ's permitting decision–which will allow harmful nitrogen oxides, fine particle, and toxic air pollution–will adversely affect the health of members of Louisiana Bucket Brigade and Sierra Club, and their enjoyment of their property and the natural resources where they live and recreate.

John Allaire has been a member of Sierra Club for four years, and a Louisiana Bucket Brigade member who lives a mile from CP2. Allaire Decl. ¶¶ 6, 10. He has lived there continuously since 2020 and has no plans to move. *Id.* ¶ 2. His 311-acre property is made up of coastal marshland and forest and hosts many species of plants and animals, some of them rare, including the federally threatened Eastern Black Rail (a small bird). Many species of migrating birds also visit his property. *Id.*¶ 3. He is an avid birder, and frequently fishes, crabs, and hunts ducks, alligators, and feral hogs on his property, (*id.* ¶ 4) and plans to continue to do so. Mr. Allaire has been engaged in efforts to oppose CP2, including commenting on the Permit at issue here. *Id*. ¶ 7. Mr. Allaire is concerned about the impacts CP2 will have on his aesthetic enjoyment of his home and property, including the impacts on the wildlife he enjoys and hunts. *Id.* ¶¶ 16-20.

Mr. Allaire is especially worried about the impacts to his health from CP2's emissions; because he lives only a mile from CP2, "I will be personally exposed to, and forced to breathe, that pollution, which could not only physically harm me, my family, and friends, but will produce unpleasant smells and visual pollution impairing my enjoyment of my property and the surrounding wetlands and waters." *Id.* ¶ 10.

Mr. Allaire has Chronic Obstructive Pulmonary Disease ("COPD"), which causes him to have shortness of breath, wheeze, and cough. *Id.* ¶ 14. Thus, he is especially concerned "about adverse health impacts to myself, and my family and friends from air pollution from CP2 LNG, due to the nature and quantity of expected emissions from the facility and from the vessels that will transport LNG from the site." *Id.* ¶ 12. He is especially worried about CP2's pollution impacts on his grandchildren, who visit him weekly (*id.* ¶ 13), and is concerned that the pollution will cause his friends to visit less frequently. *Id.* CP2's NOx emissions also concern him, because they can aggravate respiratory diseases such as COPD. *Id.* ¶ 15. Mr. Allaire is also worried about CP2's emissions of formaldehyde and benzene, both known human carcinogens. *Id.* ¶¶ 10, 13, 19.

James Hiatt has been a member of Sierra Club since 2021. Hiatt Decl. ¶ 3. He visits the area around CP2 monthly. *Id.* ¶ 6. He frequently visits John Allaire's property to view birds and wildlife, intends to continue to do so, but is worried

about breathing CP2's emissions, such as NOx and toxic and carcinogenic pollutants while he is there. *Id*. If CP2 is built, he would probably visit Mr. Allaire's property less frequently. *Id*. ¶ 7. Mr. Hiatt frequently visits a site about a mile north of Mr. Allaire's property to watch dolphins and other wildlife, and Holly Beach, about five miles from CP2 to enjoy watching the Gulf. *Id.* Mr. Hiatt is aware that modeling shows that CP2's NOx emissions would reach both the site north of Mr. Allaire's property and Holly Beach, and is worried about the respiratory impacts of those emissions. *Id*. ¶ 10. Likewise, he is concerned about exposure to CP2's emissions of benzene and formaldehyde, both of which are known human carcinogens and have a variety of other adverse health impacts. *Id.* ¶ 11.

Second, these injuries are fairly traceable to LDEQ's issuance of the Permit in this case, which authorizes CP2 to emit pollution and construct the facility that would cause the injuries. Moreover, there is a close geographic and causal nexus between CP2's permitted harmful pollution and where Petitioners' members breathe and recreate. Allaire Decl. ¶ 19 (If constructed, CP2 would be approximately one mile from Mr. Allaire's property). That is sufficient to demonstrate traceability. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 558 (5th Cir. 1996) (traceability "does not require that the plaintiffs show to a scientific certainty that the defendant's effluent, and the

defendant's effluent alone, caused the precise harm suffered by the plaintiffs") (cleaned up).

Third, a favorable decision vacating or remanding the Permit would redress these injuries. On remand, LDEQ will evaluate whether to require more stringent emission controls or deny the Permit. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572, 572 n.7 (1992).

Finally, the interests at issue here are germane to Sierra Club's and Louisiana Bucket Brigade's purposes to protect the environment and the health of their members and specifically from the injuries inflicted by the CP2 LNG terminal. Fashho Decl. ¶¶ 5-6; Rolfes Decl. ¶¶ 7-8; *see Gulf Restoration Network v. Salazar*, 683 F.3d 158, 168 (5th Cir. 2012). Moreover, neither the claims asserted nor the relief sought requires the participation of any individual member. *Id*. (quoting *Hunt*, 432 U.S. at 344).

Petitioners Louisiana Bucket Brigade and Sierra Club have standing.

## STATEMENT OF ISSUES

This case presents three closely-related issues:

Under the Clean Air Act, did LDEQ violate the Act when it issued permit limits for the CP2 LNG Terminal that did not require the Terminal to meet the Best Available Control Technology limits for emissions of: (1) nitrogen oxides; (2) volatile organic compounds; and (3) carbon monoxide?

## STATEMENT OF THE CASE

### I. Introduction

Respondent-Intervenor Venture Global plans to construct and operate the CP2 LNG Terminal in Cameron Parish, Louisiana. Petitioners here challenge LDEQ's decision to issue a Clean Air Act preconstruction permit (the "Permit") for CP2.

Petitioners challenge LDEQ's decision because LDEQ failed to impose the lawful Best Available Control Technology ("BACT") emission limits on pollutants from the 1,476 MW natural gas-fired combined-cycle turbines (the "Turbines") which will power CP2; the Turbines are the largest of many of the individual pollution sources within the planned CP2 facility.[3] Specifically, Petitioners challenge LDEQ's BACT limits on the Turbines' emissions of three pollutants that

[3] "Combined-cycle" plants use the exhaust heat from the (primary) gas turbine to run a (secondary) steam turbine that supplements the plant's electricity production.

are harmful to human health and the environment: nitrogen oxides ("NOx"); volatile organic compounds ("VOCs"); and carbon monoxide ("CO") (the "Pollutants"). The Permit authorizes CP2 to emit substantial amounts of NOx, VOCs, and CO pollution, each of which can cause or worsen an array of respiratory diseases such as asthma, particularly threatening children, the elderly, and other populations with higher asthma incidence. 75 Fed. Reg. 6474, 6480 (Feb. 9, 2010); *see also* 80 Fed. Reg. 65292, 65299 (Oct. 26, 2015) . NOx and VOCs are also precursor pollutants for ozone (commonly known as ground-level smog) and particulate matter, each of which can separately cause significant respiratory illness and worsen diseases such as asthma, emphysema, and bronchitis, and lead to difficult or painful breathing. 75 Fed. Reg. at 6480; 80 Fed. Reg. at 65299.

Petitioners do not challenge LDEQ's decisions concerning the specific control technologies it mandated as BACT for the Pollutants; rather, having required CP2 to install appropriate equipment to control these emissions, LDEQ then inexplicably imposed emissions limits far more lenient than these control technologies can achieve. Indeed, Petitioners provided LDEQ with *dozens* of examples where other, similarly-situated combined cycle gas plants use the same control equipment and are achieving far lower emissions than LDEQ permitted for the Pollutants. LDEQ responded with two rationales, repeated verbatim for each of these three limits, as to why greater emissions were justified. Neither rationale

makes any sense on its face, and one of the two appears to be based on a mistake by LDEQ. Accordingly, LDEQ's permitting decisions are arbitrary and capricious, and not supported by a preponderance of the evidence, and therefore the Permit should be vacated.

## II. Legal Framework

### A. The Clean Air Act

The Clean Air Act establishes a system of cooperative federalism for regulating new sources of air pollution. *See* 42 U.S.C. § 7410. The U.S. Environmental Protection Agency ("EPA") sets minimum standards and the states administer the various regulatory programs. *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 269 (1981). Louisiana does this through a "state implementation plan" or "SIP," subject to EPA approval. 42 U.S.C. § 7410(a)(1)-(2); *see* 40 C.F.R. § 52.970(c) (identifying EPA-approved regulations in the Louisiana SIP); LAC 33:III.101, *et seq.* (Louisiana SIP regulations). Once approved, SIP provisions become federally enforceable. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1096–97 (9th Cir. 2007).

### B. Prevention of Significant Deterioration

To ensure that new sources of pollution do not erode air quality in areas that are designated as "in attainment" or "unclassifiable" for the National Ambient Air Quality Standards ("NAAQS"), the Prevention of Significant Deterioration ("PSD") program requires new sources to obtain a preconstruction permit and

demonstrate, *inter alia*, that the source will install and operate the "best available control technology" ("BACT") for each pollutant for which EPA has established NAAQS. *See* 42 U.S.C. §§ 7470-7479. A proposed new major source, like CP2, cannot commence construction without a PSD permit. 42 U.S.C. § 7475.

C. Best Available Control Technology

As noted, the Clean Air Act requires that certain new sources, such as CP2, install and operate BACT; and all of the CP2 Terminal's sources of NOx, VOC, and CO pollution (among other pollutants) must be controlled by BACT. CI 33:10 (Basis of Decision at 10). Louisiana defines BACT as:

> an emissions limitation, including a visible emission standard, based on the maximum degree of reduction for each pollutant subject to regulation under this Section that would be emitted from any proposed major stationary source or major modification that the administrative authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant[.]

LAC 33:III.509.B.

To determine BACT, LDEQ conducts a five-part, top-down analysis, identifying all possible pollution control options, eliminating technically infeasible ones, ranking the options based on effectiveness, and ultimately selecting numeric emissions limit based on a designated pollution control technology. CI 1:6 (PSD Permit). If LDEQ imposes any numeric limit other than the most stringent, it must

provide a thorough, well-documented rationale. *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004).

## III. Factual Background

### A. Project Overview

CP2 would be in located in Cameron Parish, Louisiana, where a waterway called the Calcasieu Ship Channel meets the Gulf, and it will liquify natural gas for export as liquified natural gas ("LNG"). CP2 will have 36 liquifaction "units" to purify and liquify natural gas, along with several LNG storage tanks, and two docks where LNG would be loaded onto ships for export. CI 33:2 (Basis for Decision). CP2 would be supplied with natural gas via the 85-mile CP Express natural gas pipeline, also owned by Venture Global. CI 12:334 (CP2 PSD Application at 1-2). CP2 is one of the largest single LNG terminal projects ever approved, with nameplate capacity of 20 million metric tons (mmt) per year, and an annual peak capacity of 28 mmt. CI 33:2 (Basis for Decision).

Although natural gas will be pre-treated and liquefied using refrigeration compressors driven by electric motors, CP2 will construct and operate a 1,470 MW combined-cycle electric generation power plant—the largest individual source of pollution at the facility, and the focus of this case—to provide electricity to the LNG terminal. *Id*.

As the name CP2 suggests, this Terminal is not the first of its kind; it is to be built adjacent to Venture Global's existing Calcasieu Pass project, sometimes called "CP1." CI 33:1 (Basis for Decision). Another LNG terminal, Commonwealth LNG, will sit directly across the Calcasieu Ship Channel, only a half mile from CP2. *Commonwealth LNG LLC*, 191 FERC ¶ 61,205 (June 18, 2025) (reapproved after remand).

B. Procedural History

Venture Global submitted its Application for the Permit on July 27, 2022. CI 33:1 (Basis for Decision). LDEQ published public notice of a draft permit on January 31, 2025 (*id.*, p. 4) held a public hearing on March 6, 2025 (*id.*) accepted public comments until March 7, 2025 (*id.*), and issued the Permit on July 22, 2025. CI 32:1-2 (CP2 PSD Permit).

C. The Permit

The Permit authorizes significant pollution from more than a dozen specified sources at CP2*, e.g.,* the Turbines, hot oil heaters, acid gas thermal oxidizers, amine storage tanks, several different flares, etc. CI 12:337 (CP2 PSD Application at 1-5). This challenge involves only the Permit's limits for the Pollutants emitted from CP2's Turbines. Although the record demonstrates that LDEQ has required similarly-situated combined cycle gas turbines to achieve lower emission limits

using the same control equipment, the Permit does not require CP2 to achieve those lower emission rates. CI 27:33-35; 54-59 (Report of Dr. Ron Sahu at 10-15).

The table below shows, for each of the Pollutants, the Permit's emission limit for the Turbines and the resulting allowable annual emissions.

| **Pollutant** | **Permit emission limit (parts per million)**[4] | **Annual emissions (tons/year)**[5] |
|---|---|---|
| CO | 5.0 | 552 |
| $NO_x$ | 2.5 | 452 |
| VOCs | 3.0 | 87 |

CP2 will also emit more than 18 tons of toxic pollution each year, including hazardous pollutants like benzene and formaldehyde.[6]

## SUMMARY OF ARGUMENT

Petitioners do not challenge the BACT emission control *technologies* the Permit mandates for emissions from CP2's combined-cycle Turbines, which are dry low NOx combustors and Selective Catalytic Reduction for NOx, and

[4] CI 32:15 (CP2 PSD Initial Permit at 13).

[5] The PSD Application (at CI 2:6) reflects the annual allowable emissions from each combined-cycle generating unit at the CP2 Terminal. The Permit allows CP2 to operate ten units (CI 33:2 (Basis for Decision)), so the total allowable emissions from the Turbines can be determined by multiplying the total annual emissions for each combined-cycle unit by ten.

[6] The PSD Application (at CI 2:7) also reflects the total toxic emissions allowed at each combined-cycle unit, so the total annual toxic emissions can be similarly calculated by multiplying the allowable emissions for each unit by ten.

oxidation catalysts for VOCs and CO (together, the "Control Technologies"). CI 33:11 (Basis for Decision). Rather, having required the Control Technologies, LDEQ inexplicably only required CP2 to meet BACT emissions limits far higher than these technologies are capable of achieving.

Petitioners documented in comments on the draft permit that the Control Technologies were not only capable of meeting far more stringent standards than the limits LDEQ imposed in the Permit on the Turbines' NOx, VOC, and CO emissions (the "Emission Limits"), but were in fact meeting such standards at other combined-cycle gas turbines, including at power plants for which LDEQ has issued similar air permits in recent years. CI 27:57 (Report of Dr. Ron Sahu at 14).

LDEQ provided an identical response to each of these comments, giving two "explanations". First, "[t]he CP2 Combined Cycle Combustion Turbines at the CP2 LNG Terminal will operate within a power island, isolated from the utility power grid, which results in different operational considerations." CI 33:67 (Response to Comment Document at 24). What these "different operational considerations" are, and how or why they would justify the Emission Limits for the CP2 Turbines remains a mystery; LDEQ did not provide any additional information or explanation beyond this unsupported statement.

LDEQ's second explanation is no better. CP2's Turbines will burn both natural gas and "fuel gas,": the latter is "compositionally different than natural gas

and has a higher HHV [“higher heating value”] than that typically ascribed to natural gas.” CI 33:51 (Response to Comment Document at 24). As with the “different operational considerations”, it remains a mystery how fuel gas’s “compositional difference” or higher heating value justifies the Permit’s Emission Limits for the CP2 Turbines. Moreover, LDEQ’s statement that the fuel gas the Turbines will burn contains “heavy carbon condensates” with very high heating values appears to be based on a mistake; as Venture Global states repeatedly in its Application for the Permit, the fuel gas containing those condensates will not be burned in the Turbines, but only in CP2’s hot oil heaters, a completely separate emissions unit with its own emission limits (and which are not at issue here.) Agencies must have a rational basis for their decisions, and LDEQ’s failure to articulate or support any such rational basis for the Permit’s Emissions Limits for CP2’s combined-cycle Turbines requires his court to vacate the Permit.

An “agency is required to make basic findings supported by evidence and ultimate findings which flow rationally from the basic findings; and it must articulate a rational connection between the facts found and the order issued.” *Save Ourselves, Inc. v Louisiana Env’t Control Comm’n*, 452 So.2d 1152, 1159-60 (1984). “[W]e must also ensure that the agency examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, and assess whether the

agency's decision was based on a consideration of the relevant factors." *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (cleaned up).

## ARGUMENT

### I. Standard of Review

The court reviewing agency action:

> may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority of the agency; (3) Made upon unlawful procedure; (4) Affected by other error of law; (5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review.

La. R.S. § 49:978.1(G). *See Healthy Gulf v Secretary, LA Dept of Nat Resources*, 407 So.3d 705, 711 (2024). The Fifth Circuit applies this standard when reviewing Louisiana air permits. *Sierra Club v. Louisiana Dep't of Env't Quality*, 100 F.4th at 562-63 .

An arbitrary decision shows "disregard of evidence or of the proper weight thereof" while a capricious decision "has no substantial evidence to support it or the conclusion is contrary to substantiated competent evidence." Where the law allows the agency to exercise discretion, the statute's plain language concludes that

such exercise must be neither abusive nor clearly unwarranted. *LaRocca v. Louisiana*, 364 So.3d 1246, 1260 (La. App. 5 Cir. 5/10/23) (citations omitted). "Subsection G(5) is used in reviewing an agency's exercise of discretion, its conclusions of law, and mixed questions of fact and law. Subsection G(6) is used in reviewing questions of fact[.]" *Id*. 1260-61.

Under subsection (G)(6), the reviewing court "shall make its own determination and conclusions of fact by a preponderance of evidence based on its own evaluation of the record reviewed in its entirety." La. R.S. § 49:978.l(G)(6); *MultiCare v. State, Dept. of Health & Hospitals*, 00-2001, p. 3 (La. App. 1st Cir. 11/9/01), 804 So.2d 673, 675; *Holtzclaw, To Defer or Not To Defer: The Standard of Review Regarding Administrative Rulings In The Appellate Courts of Louisiana,* 40 S.U.L. REV. 435, 449-451 (Spring 2013).

Under the Federal Administrative Procedure Act, an agency must show it examined "the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins*., 463 U.S. 29, 43 (1983). An agency decision is arbitrary if it has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to

the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.*

While not identical, under either standard the Court must determine whether LDEQ considered irrelevant factors, failed to evaluate an important factor, made a decision not supported by record evidence, or failed to reasonably explain its decision. Here, LDEQ failed under either standard.

## II. The Permit's NOx, VOC, and CO Emission Limits for CP2's Combined Cycle Turbines Do Not Reflect the Best Available Control Technology, and Are Arbitrary and Capricious.

BACT is an "emissions limitation" for each pollutant based on "*the maximum degree of reduction*," which LDEQ must, on a case-by-case basis, accounting for "energy, environmental, and economic impacts and other costs." LAC 33:III.509.B (emphasis added). BACT is not the control technology itself, but the emission limitation derived from the use of that technology. *See* LAC 33:III.509.B (Definition of BACT); *see also* CI 12:350 (CP2 PSD Application at 3-1) ("BACT is 'an emission limitation,' not an emission reduction rate or a specific technology."). The Permit's Emission Limits do not meet this standard.

### A. <u>LDEQ Failed to Explain the Basis of its Decision That the Permit's Emission Limits Are BACT.</u>

Petitioners' comments on the draft version of the Permit listed 49 combined cycle natural gas turbines, including turbines LDEQ has permitted in recent years, that meet NOx limits of 2.0 parts per million ("ppm"), significantly lower than the

Permit's 2.5 ppm standard (CI 33:65-66 (Response to Comment Document at 38-39)); similarly, Petitioners listed 27 combined cycle natural gas turbines meeting CO emission limits of 2.0 ppm (or lower) rather than the Permit's standard of 5.0 ppm (CI 33:67 (Response to Comment Document at 40)); and then listed 14 combined cycle natural gas turbines meeting VOC limits between 0.7 and 2.0 ppm rather than the Permit's 3.0 ppm (CI 33:68-69 (Response to Comment Document at 41-42)).

LDEQ's Public Comments Response Summary gave identical responses to each of Petitioners' pollutant-specific technical comments pointing out that dozens of other combined-cycle plants were meeting these lower NOx, VOC, and CO emission limits:

> The Combined Cycle Combustion Turbines at the CP2 LNG Terminal will operate within a power island, isolated from the utility power grid, which results in different operational considerations. In addition, as explained in LDEQ Response to Comment No. 14, the combustion Turbines and duct burners in the HRSGs will be fired with natural gas *and* fuel gas (i.e., boil-off gas, flash gas, and/or condensate), which is compositionally different than natural gas and has a higher HHV than that typically ascribed to natural gas. LDEQ's BACT determination for [NOx/VOC/CO] emissions accounts for the operational considerations and fuel mix unique to the Combined Cycle Combustion Turbines at the CP2 LNG Terminal.

CI 33:67-69 (Response to Comment Document at 40 (for NOx), 41 (for CO), and 42 (for VOC)) (emphasis in original)).

*i. The "Power Island" Explanation*

As noted, LDEQ's first justification of each of the Emission Limits was, "[t]he CP2 Combined Cycle Combustion Turbines at the CP2 LNG Terminal will operate within a power island, isolated from the utility power grid, which results in different operational considerations." CI 33:67, 68, 69 (Response to Comment Document 40, 41, 42). That is the entirety of that explanation; LDEQ never identifies or explains what these "different operational considerations" are, how they would prevent the Turbines from meeting the lower emission limits for NOx, VOCs, and CO that dozens of other combined cycle turbines are meeting, or otherwise justify the Permit's Emission Limits for CP2's Turbines.

LDEQ's failure to identify these "operational considerations" or explain why they justify the Permit's Emissions Limits is arbitrary and capricious and is not supported and sustainable by a preponderance of evidence. *In re American Waste and Pollution Control Co.,* 642 So.2d 1258, 1266 (1994) (vacating LDEQ permit for hazardous waste facility because agency failed to "articulate a rational connection between [the Secretary's] factual findings and his order . . . Instead, his written decision contains only conclusions without stated bases.").

*ii. The "Fuel Gas" Explanation*

As noted, Petitioners provided technical comments pointing out that combined cycle power plants routinely achieve lower NOx, VOC, and CO

emissions than the Permit's Emission Limits. In each instance, LDEQ's response was identical: "*as explained in LDEQ Response to Comment No. 14,* the combustion Turbines . . . will be fired with natural gas and fuel gas (i.e., boil-off gas, flash gas, and/or condensate), which is compositionally different than natural gas and has a higher HHV than that typically ascribed to natural gas." *See* CI 33:66 (NOx Response to Comment Document at 39)), CI 33:67 (VOC Response to Comment Document at 40), CI 33:68 (CO Response to Comment Document at 41) (emphasis added). This explanation fares no better than LDEQ's "Power Island" explanation. Response to Comment 14 states:

> The combustion Turbines and duct burners in the heat recovery steam generators (HRS Gs) will not be fired solely by natural gas, but by natural gas and fuel gas, which is compositionally different than natural gas. The composition of natural gas can vary, but is expected to contain constituents (impurities) that must be removed either because they would freeze in the liquefaction process (e.g., CO2, water, high molecular weight hydrocarbons) or to meet the final LNG specifications (e.g., H2S).[44] These constituents will be removed in the facility's pretreatment system, which will generate a relatively small amount of heavy hydrocarbon condensate. Because this condensate has a higher heating value (HHV) in excess of 3000 BTU/scf, when it is mixed with natural gas, boiloff gas, and flash gas, the resulting fuel gas mixture has a higher HHV than that typically ascribed to natural gas.[45] LDEQ's BACT determination for [greenhouse gas] emissions accounts for the fuel mix unique to the Combined Cycle Combustion Turbines at the CP2 LNG Terminal.

CI 33:51 (Response to Comment Document at 24).[7] Thus, according to LDEQ, the Emission Limits are justified because first, the Turbines are fired by a combination of natural gas, "boiloff gas, flash gas, and heavy hydrocarbon condensates" (CI 33:51 (Response to Comment Document at 24)); second, the "relatively small amount" of heavy hydrocarbon condensates has a heating value greater than 3000 Btu/scf;[8] and third, the heavy hydrocarbons' heating value justifies the Permit's higher NOx, VOC, and CO (and greenhouse gas) emission limits. *Id*.

This explanation completely falls apart at the first step, because Venture Global expressly and repeatedly states that the heavy hydrocarbon condensates are burned *only* in CP2's hot oil heaters, *a completely separate emissions source* within the Terminal (CI 12:354-55 (CP2 PSD Application at 3-5 to 3-6) and ***not*** *in the combined cycle Turbines:*

> The initial step of the liquefaction process is additional purification of the natural gas stream from the pretreatment facilities to remove heavy hydrocarbons which would freeze during the liquefaction process if not removed beforehand. *The heavy hydrocarbon removal unit chills the pretreated feed gas to a point at which most of these*

---

[7] LDEQ Footnote 44 in the original Response to Comment text refers to, "EDMS Doc ID 13411196 (p. 18 of 500)"; LDEQ Footnote 45 in the original Response to Comment text states, "See, for example, EDMS Doc ID 13410576 (p. 5 of 541)."

[8] Fuel heating values are often expressed in terms of volume, e.g., British thermal unit per standard cubic foot ("Btu/scf").

> *heavy components condense and are then separated in a distillation process. The small quantities of products removed are recovered and used as fuel by the Liquefaction Plant's hot oil heaters.*

CI 12:335 (CP2 PSD Application at 1-3) (emphasis added).

> The proposed combustion Turbines, flares, hot oil heaters, and acid gas thermal oxidizers will be permitted to combust a fuel gas comprised of pipeline quality feed gas, boil-off gas, and/or liquefier end flash gas. *Additionally, the proposed hot oil heaters will be permitted to combust vaporized hydrocarbon condensate associated with the heavy hydrocarbons removal system.*

CI 12:355 (CP2 PSD Application at 3-6) (emphasis added).

> A mixture of the following gaseous fuels, in any combination, will be combusted in the [hot oil] heaters:
> - *Vaporized Condensate*;
> - Flash Gas; and
> - Natural Gas.

CI 12:425 (CP2 PSD Application at 3-76) (emphasis added).

In contrast, "Each [combined-cycle turbine] will combust natural gas or fuel gas comprised of a mixture of pipeline quality feed gas, boil-off gas, and flash gas." CI 12: 356 (CP2 PSD Application at 3-7). There is no mention in either Venture Global's Permit Application or the Permit of the Turbines burning condensates. Thus, to the extent LDEQ's justification for the Emission Limits is based on the Turbines burning heavy hydrocarbon condensates, it is demonstrably incorrect. And, of course, even if the Turbines *were* burning the condensates, LDEQ again offers no explanation as to how burning those condensates means that

the Turbines could not meet the same emission standards that dozens of other combined-cycle turbines are meeting or otherwise justify the Permit's Emission Limits.

Moreover, LDEQ's response that "the resulting fuel gas mixture has a higher HHV than that typically ascribed to natural gas" cites "EDMS Doc ID 13410576 (p. 5 of 541)." CI 33:51 (Statement of Basis at 24). That citation, in turn, refers to Venture Global's PSD Application, which provides heating values of 1,020 Btu/scf and 1,049 Btu/scf values, respectively, for the natural gas and fuel gas that the Turbines will burn. *See* CI 2:5; CI 12:823 (CP PSD Application, App'x B, Emissions Calculations). Venture Global's Application then repeats those two figures verbatim as the relative heating values for natural gas and fuel gas for all other CP2 emission sources burning natural gas and fuel gas *except the hot oil heaters. See, e.g.*, CI 2:9 (single cycle turbines); CI 2:12 (smaller aeroderivative single cycle combustion turbines). As for the hot oil heaters, the natural gas heating value remains 1,020 Btu/scf, but the fuel gas heating value is now expressed in completely different units: 21,469 Btu/lb. *See* CI 2:16 (CP2 PSD Permit).[9] This is further confirmation that the condensates will be burned only in

[9] As noted, fuel heating values are sometimes expressed by volume, Btu/scf. They may also be expressed by weight, e.g., British thermal unit per pound ("Btu/lb").

the hot oil heaters, because they will no longer be burning just gases whose heating (or other) value can be expressed in terms of a unit of volume (*i.e.*, a "standard cubic foot"); they are also burning the liquid condensates, and the combination of liquids and gases requires expression of heating (or other) values in terms of a unit of weight (*i.e.,* Btu/lb).

Thus, without the "heavy carbon condensates" that LDEQ mistakenly believe are being burned in the Turbines, the heating value of fuel gas is all of 3% greater than the heating value of natural gas, and LDEQ did not claim a 3% increase in the heating value of an unknown (and presumably variable) portion of the fuel for CP2's Turbines would prevent them from meeting the lower emission limits for NOx, VOCs, and CO that dozens of other combined cycle plants are meeting, or otherwise justify the Permit's Emission Limits. Nor is there any basis in the record for LDEQ making such a claim now.

And, not to put too fine a point on this, it is worth noting the heating value of natural gas itself is variable. CP2's Application cites an EPA guidance document as support for its assumed 1,020 Btu/scf heating value for natural gas: "Natural Gas Higher Heating Value (HHV) from U.S. EPA, AP-42, Section 1.4 Natural Gas Combustion." *See* CI 2:5; CI 12:823. Section 1.4 of that EPA document states, "The average gross heating value of natural gas is approximately 1,020 Btu/scf,

usually varying from 950 to 1,050 Btu/scf."[10] So, the same source Venture Global relies on for the 1,020 Btu/scf value for natural gas also states that the 1,049 Btu/scf value for CP2's fuel gas is within the normal variability of natural gas; CP2's feedstock natural gas could have such a heating value. Thus, even without the condensates that LDEQ mistakenly believes are being burned in the Turbines' fuel gas, there is literally no evidence that even if the Turbines burned 100% fuel gas it would have any bearing on their ability to meet the stricter limits other combined cycle turbines are meeting.

In short, there is no basis for LDEQ's "explanation" that burning fuel gas combined with heavy hydrocarbon condensates (or even without them), along with natural gas in the Turbines would prevent the Turbines from meeting the lower emission limits for NOx, VOCs, and CO that dozens of other combined cycle plants are meeting, or otherwise justify the Permit's Emission Limits for the Turbines. LDEQ's failure to identify or explain any basis for its conclusion that the Permit Limits are justified based on the higher heating value of fuel gas combined with heavy hydrocarbon condensates, and, in fact, that this conclusion itself is based on a mistake makes LDEQ's decision to issue the Permit with the Emission

[10] EPA, AP 42, Fifth Edition, Volume I Chapter 1: External Combustion Sources, Section 1.4 Natural Gas Combustion, *available at* https://www.epa.gov/sites/default/files/2020-09/documents/1.4_natural_gas_combustion.pdf.

Limits arbitrary and capricious, and not supported and sustainable by a preponderance of evidence. *See Save Ourselves, Inc. v Louisiana Env't Control Comm'n,* 452 So.2d at 1159-60 (An "agency is required to make basic findings supported by evidence and ultimate findings which flow rationally from the basic findings; and it must articulate a rational connection between the facts found and the order issued."); *In re American Waste and Pollution Control Co*., 642 So.2d at 1266; *In re E.I. du Pont de Nemours & Co.*, 674 So.2d 1007, 1011 ((La.App. 1 Cir. 4/24/96) (LDEQ waiver of waste disposal restrictions was arbitrary and capricious because its decision "contains no basic findings supported by the evidence, ultimate findings or an articulated rational connection between the facts found and the order issued").

B. <u>Venture Global's Application for the Permit Conceded that CP2's Combined Cycle Turbines Could Meet a Lower NOx Standard than the Permit's 2.5 ppm Limit.</u>

In its permit Application, Venture Global itself said that the NOx BACT control technologies it chose were capable of meeting emission limits of "~ 2 ppmv to 3 ppmv." CI 12:359 (CP2 PSD Application at 3-10).[11] Nevertheless, without explanation, Venture Global proposed (and LDEQ adopted) a BACT limit

[11] The record refers to the Permit's emission limits variously in terms of parts per million ("ppm") and parts per million by volume ("ppmv"). For the purposes of this appeal, and in practice, the terms are used interchangeably.

of 2.5 ppm based on these technologies (plus the use of "good combustion practices"). *Id.* That cursory explanation fails to justify the rejection of the more stringent NOx limit in favor of a less stringent one. CI 12:354 (CP2 PSD Application at 3-5); *see also Alaska Dep't of Env't. Conservation*, 540 U.S. at 497 (holding if a PSD applicant selects any numeric limit other than the most stringent, it must provide a thorough, well-documented rationale).

## III. Vacatur Is the Appropriate Remedy.

Because LDEQ's final BACT limitations for the CP2 Turbines are not supported by a preponderance of the evidence, and the agency failed to rationally explain why CP2 was incapable of meeting more stringent emission limits routinely achieved by similar sources (including other combined cycle turbines in Louisiana), the Permit is arbitrary or capricious, and LDEQ's decision to issue the Permit violates La. R.S. § 49:978.1(G)(5) and (6). As such, this court should vacate that decision and remand the Permit to LDEQ. *In re American Waste and Pollution,* 642 So.2d at 1265-66*; In re E.I. du Pont,* 674 So.2d at 1011; *In re Rubicon, Inc.,* 670 So.2d 475, 482; 95-0108 (La. App. 1 Cir. 2/14/96); La. R.S. § 49:978.1(G)(5) and (6).

## CONCLUSION

For these reasons, Petitioners respectfully request that the Court vacate and remand the CP2 PSD Permit.

Dated: January 15, 2026

Respectfully submitted,

*s/ Joshua D. Smith*
David Bookbinder
Environmental Integrity Project
888 17th Street, NW, Suite 801
Washington, DC 20006
301-751-0611
dbookbinder@environmentalintegrity.org

*Counsel for Petitioners Louisiana Bucket Brigade and Sierra Club*

Joshua D. Smith
Sierra Club
2101 Webster St, Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5560
joshua.smith@sierraclub.org
*Attorney for Sierra Club*

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2026, I electronically filed the foregoing Initial Brief of Petitioners with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

*s/ Joshua D. Smith*
Joshua D. Smith

*Counsel for Sierra Club*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32, I certify that this brief complies with the type-volume limitations of Rule 32(a)(7) because it contains 6,521 words, excluding the parts of the brief exempted by Rule 32(f); and complies with the typeface and type style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

*s/ Joshua D. Smith*
Joshua D. Smith

*Counsel for Sierra Club*

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I further hereby certify that in the foregoing brief filed using the Fifth Circuit CM/ECF document filing system, (1) the privacy redactions required by Fifth Circuit Rule 25.2.13 have been made, and (2) the electronic submission is an exact copy of the paper document.

*s/ Joshua D. Smith*
Joshua D. Smith

*Counsel for Sierra Club*